## STATE OF MARYLAND *v.* MARK EDWARD BLIZZARD

[No. 22, September Term, 1976.]

*Decided November 29, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*Bruce C. Spizler, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellant.

*Robert N. Dugan* for appellee.

SMITH, J., delivered the opinion of the Court. LEVINE and ELDRIDGE, JJ., dissent and LEVINE, J., filed a dissenting opinion in which ELDRIDGE, J., concurs at page 575 *infra.*

We shall here reverse the decision of the Court of Special Appeals in *Blizzard v. State,* 30 Md. App. 156, 351 A. 2d 443 (1976), which was based upon its reading of the decisions of the Supreme Court in *McLeod v. Ohio,* 381 U. S. 356, 85 S. Ct. 1556, 14 L.Ed.2d 682 (1965), and *Massiah v. United States,* 377 U. S. 201, 84 S. Ct. 1199, 12 L.Ed.2d 246 (1964).

Appellee, Mark Edward Blizzard (Blizzard), was convicted by a Baltimore County jury of unlawfully using a handgun in the commission of a felony or a crime of violence and on three separate charges of robbery with a dangerous and deadly weapon, all of which grew out of the same incident. We granted the State's petition for the writ of certiorari in order that we might give consideration to the propriety of the admission into evidence of the statement made by Blizzard to a police officer after indictment and while in custody, said by Blizzard and the Court of Special Appeals to have been contrary to the holdings in *McLeod* and *Massiah.* We also directed counsel to brief and argue the question of "[w]hether the alleged violation also constituted a violation of [Blizzard's] rights under the Maryland Declaration of Rights." The applicable provisions of the Maryland Declaration of Rights are Art. 21, stating "[t]hat in all criminal prosecutions, every man hath a right . . . to be

allowed counsel . . ." , and Art. 22, to the effect "[t]hat no man ought to be compelled to give evidence against himself in a criminal case."

As Judge Gilbert put it for the Court of Special Appeals:

> "Blizzard's defense was twofold. Firstly, he sought to show through three witnesses and himself that he was at home repairing a friend's automobile at the time the pharmacy was robbed. Secondly, he produced the testimony of two inmates of the Baltimore County jail who told the jury that a co-defendant of appellant, one Markert, had told them that he and one Phillips had robbed the pharmacy, and that they, Markert and Phillips, were going 'to frame' Blizzard." *Id.* at 160.

On cross-examination Blizzard was asked whether he "recall[ed] ever having a conversation with Police Officer Detective Zero about a week or so [prior to trial] about th[e] case [for which he was then] on trial . . . ." An objection to the question was overruled. Defense counsel then asked to approach the bench. (Prior to that time no reason for the objection had been specified. Under Maryland Rule 522 b, made applicable to criminal proceedings by Rule 725 f, "unless requested by the court it [was] not . . . necessary to state the grounds therefor.") At the bench he said he "would object to any inquiry by the Assistant State's Attorney as to any conversation one week [previously] between Sergeant Zero and [his] client as an obvious violation of the Supreme Court's decision of *Massiah vs. United States* (1964) where the Court said it was improper for any police official, prosecutor, to talk to a Defendant after the indictment had been returned out of the presence of the attorney." He opined that "in this case any conversation between Sergeant Zero and [his] client violated this right," and added that "[w]hen [he] found out . . . that Sergeant Zero had talked to [his client] without [his] permission [he] complained to [the Assistant State's Attorney] about it at the time." He observed that he learned of this about a week previously and that there had been no repetition. The State explained that it

was its "position . . . that since this conversation with the police officer was initiated by the Defendant himself under circumstances where the Defendant, with or without the knowledge of his counsel, directly contacted the Police Department requesting that a member of the Department come down to talk with him about certain matters and in response to this a representative of that Department did go and talk with him, under those circumstances the State urges that the *Massiah* rule does not apply." Inquiry was then made of Blizzard as to whether he recalled the conversation. He did. He replied in the negative to the question of whether or not it was "true that this was at [his] insistence." He was then asked whether he "contact[ed] the Police Department and ask[ed] a representative to come down and talk with [him] about this matter." He named another individual who, he said, made the request. He again replied in the negative to the further question of whether he himself made the contact. Questions were then propounded as to the circumstances of the call, the name of the officer who allegedly was requested to make the call, etc. The question of whether he "recall[ed] what [he] told Police Officer Zero when he came down" was refined by an indication that the inquiry was confined to what he told Sgt. Zero relative to this particular case. An objection was overruled. No reason for the objection was stated. However, at the bench immediately thereafter defense counsel said that "[i]n addition to the other objection which [he] made [he] th[ought] there [was] an objection to the possible violation of Miranda rights," although he was "not waiving the first point . . . ." The trial judge explained that he was "going to allow this testimony . . . because the State ha[d] stated the police officer [was] going to testify it was at [Blizzard's] request, and [the judge] assume[d] [the State was] going to put him on to testify [Blizzard] asked him to come down and [Blizzard] voluntarily talked to him," saying that "[u]nder those circumstances it [was] allowable testimony." Then, in response to a question as to what he told Sgt. Zero relative to this particular case, Blizzard replied, "Nothing."

The State called Sgt. Zero as a rebuttal witness. He testified that he received a telephone call from the jail to the effect that Blizzard and another prisoner wished to talk to Corp. Purnell. Zero said he inquired as to whether he would do. The trial judge, who had sustained an objection to one question by the State, asked Sgt. Zero directly whether he went down to the jail. Zero replied:

"Yes, I went down to the Jail and I talked to the Defendant and another subject, and when I first met him I told him I didn't even want to talk to him about the armed robbery he was involved in being the Defendant."

The record then is:

"By Mr. Seibert [(Assistant State's Attorney)]:

"Q Is that the first conversation?

"A Yes.

"Q What happened then?

"A I told him I had him up tight in this armed robbery.

"MR. DUGAN [(Defense Counsel)]: Objection. May we approach the Bench?

"THE COURT: Objection overruled. This is what you told him?

"THE WITNESS: Yes, this is what I told him.

"THE COURT: What did he answer?

"MR. DUGAN: May we approach the Bench?

"THE COURT: Let him finish the question.

"THE WITNESS: He answered, he told me he knew it but he wished to talk to me about other cases.

"THE COURT: That is what he said?

"THE WITNESS: Yes, sir.

"THE COURT: Now, you may approach the Bench.

"(The following proceedings occurred at the

Bench out of the hearing of the members of the Jury:)

"MR. DUGAN: The defense would move for a mistrial at this point on the basis of the testimony of Sergeant Zero, based on other motions we raised previously. We don't think a proper foundation was laid for this testimony at all. The testimony is a violation of the Defendant's constitutional right, and we therefore move for a mistrial.

"THE COURT: The mistrial is denied. He has testified that he received information which he can testify to, that this Defendant wanted to see him. When he first went in he told the Defendant he didn't even want to talk to him about it whatsoever, and the Defendant continued a conversation with him. He is not violating his constitutional rights. The motion for a mistrial is denied and we will proceed.

"(The proceedings at the Bench were then concluded.)

"THE COURT: The motion is denied.

"By Mr. Seibert:

"Q Sergeant, was there a further statement made by the Defendant to you other than what you testified to?

"MR. DUGAN: Objection.

"THE COURT: Overruled.

"A This was pretty much the gist of the conversation, sir.

"MR. SEIBERT: Your witness.

"MR. DUGAN: No questions.

"THE COURT: Thank you, sir. You may step down.

"(The witness was excused.)"

The Court of Special Appeals held that the "[a]dmission of Sergeant Zero's testimony concerning [Blizzard's]

statement, under the circumstances of the case *sub judice,* constitute[d] reversible error."

A review of the facts and holdings in *Massiah* and *McLeod* will be helpful. Massiah, a merchant seaman, was arrested and subsequently indicted for possession of narcotics aboard a United States vessel. He retained counsel and pleaded not guilty. He was released on bail along with a codefendant. Without Massiah's knowledge, the codefendant decided to cooperate with the government agents in their continuing investigation of the narcotics activities in which the codefendant and others had been engaged. The codefendant permitted an agent to install a radio transmitter under the front seat of his automobile by which the narcotics agent could overhear from some distance away conversation carried on in the car. Massiah made several incriminating statements during the course of a conversation with his codefendant. At trial these statements were brought before the jury through the testimony of the narcotics agents. The Court gave consideration to the contention of Massiah that his "Fifth and Sixth Amendment rights were violated by the use in evidence against him of incriminating statements which government agents had deliberately elicited from him after he had been indicted and in the absence of his retained counsel." In reversing the conviction Mr. Justice Stewart concluded the opinion for the Court by stating:

> "We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial." *Id.* at 207. (Emphasis in original.)

This case was followed by *McLeod v. Ohio,* 378 U. S. 582, 84 S. Ct. 1922, 12 L.Ed.2d 1037 (1964), in which in a per curiam

opinion the Court vacated the judgment and remanded the case to the Supreme Court of Ohio for consideration in the light of *Massiah.*

In *State v. McLeod,* 1 Ohio St. 2d 60, 203 N.E.2d 349 (1964), the court attempted on the remand to distinguish *McLeod* from *Massiah.* McLeod had been indicted for murder in the first degree. Eight days subsequent to the indictment he voluntarily made an oral confession in the presence of a deputy sheriff and an assistant prosecuting attorney while riding in the sheriff's automobile searching for the gun "used in the holdup." The Ohio court pointed out that the "defendant's incriminating statements were made by him while he was voluntarily endeavoring to aid the police in securing evidence of the crime," that he "was not then represented by counsel and had not even requested counsel." It said that McLeod "had not yet been arraigned and . . . the 'circumstances' under which his incriminating statements were given were wholly different from those in *Massiah.*" Accordingly, it was "of the opinion that the judgment of the Court of Appeals should be affirmed." The case returned to the Supreme Court, 381 U. S. 356, where the Court reversed, giving no reason other than a citation to *Massiah.*

A probable basis for the decision of the Supreme Court in the second *McLeod* case was set forth in the concurring opinion in *State v. Arrington,* 3 Ohio St. 2d 61, 209 N.E.2d 207 (1965), *cert. denied,* 383 U. S. 906 (1966), where Judge O'Neill said:

"It requires no speculation on the part of this court to determine the basis for the reversal by the United States Supreme Court of *State v. McLeod, supra.* The defendant in that case was neither granted the right to confer with counsel, nor was he informed of his right to counsel or his right to remain silent. Hence, any statements made by him under those circumstances could not be used against him without prejudice to his constitutional rights. The [Ohio] court, in *McLeod, supra,* unduly limited the application of both *Massiah v.*

*United States* (1964), 377 U. S. 201, 12 L.Ed.2d 246 and *Escobedo v. Illinois* (1964), 378 U. S. 478, 12 L.Ed.2d 977." *Id.* at 62-63.

Massiah was again before the Supreme Court in *Beatty v. United States*, 389 U. S. 45, 88 S. Ct. 234, 19 L.Ed.2d 48 (1967). There, in a per curiam opinion of one sentence, the Court said that the writ of certiorari was granted and judgment was reversed, citing *Massiah.* The facts of that case may be gleaned from *Beatty v. United States*, 377 F. 2d 181 (5th Cir. 1967). The charges involved unlawful possession and sale of a machine gun. The accused, after indictment, called the government informer and requested him to meet the accused, naming a time and place for the meeting. The meeting was held in the vehicle of the informer. A government agent was secreted in the trunk where he overheard the entire conversation, which was of an incriminating nature. The Fifth Circuit discussed *Massiah,* including the conclusion of the opinion which we have heretofore quoted. It said at p. 189 that it "interpret[ed] this language as meaning that the exclusionary rule does not apply to all incriminating statements made under any circumstances by an accused after his indictment, but such rule only applies to those statements induced or deliberately elicited by officers or their agents from the accused after his indictment while he is without assistance of counsel."

The only other case in which our research shows the Court to have even remotely considered *Massiah* and *McLeod* is *Miller v. California*, 392 U. S. 616, 88 S. Ct. 2258, 20 L.Ed.2d 1332 (1968), in which "[t]he writ of certiorari [was] dismissed as improvidently granted." Mr. Justice Marshall wrote a dissent joined by Chief Justice Warren and Justices Douglas and Brennan. The facts of the case pertinent to this issue may be determined both from the dissent and from the opinion in *People v. Miller*, 245 Cal.App.2d 112, 53 Cal. Rptr. 720 (Dist. Ct. App., 4th Dist., Div. 1 1966). The California court said that "an undercover agent, working in narcotics and employed by the sheriff . . . was falsely booked in the jail as a narcotics violator and placed in a cell with defendant for the purpose of conversing with defendant in

the obvious hope that defendant would make some statement helpful to the prosecution. She remained in the cell for approximately a week. [She] reported from time to time to the officers her conversations with defendant. [She] testified at the trial to a portion of her conversation with defendant. She, of course, did not tell defendant that she was a law enforcement agent. She did tell defendant that the matters she and defendant discussed should be revealed to defendant's attorney." As Mr. Justice Marshall put it, "The District Court of Appeal clearly agreed that petitioner's federal contention based on [the Supreme Court] decisions in *Massiah* and *Escobedo* [*v. Illinois*, 378 U. S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964),] was valid. 245 Cal.App.2d 112, 144, 53 Cal. Rptr. 720, 740. The court stated it did not reverse the conviction only because it viewed [the undercover agent's] testimony as non prejudicial."

Our only contact with *Massiah* was in *Elliott v. Warden*, 243 Md. 627, 222 A. 2d 55 (1966). In a case brought under the Post Conviction Procedure Act it was contended, among other things, that there was error in admitting into evidence a post-indictment statement taken from the accused in which he admitted shooting the victim, although he attempted to justify the killing as done in self-defense. Counsel was not present when the statement was made. It was claimed that the accused was not advised of his right to have an attorney appointed to assist him in his defense. The opinion stated that the trial judge "found as a fact that the petitioner had not requested an attorney but ruled that there were no facts presented which would permit the finding that the petitioner had intentionally relinquished or abandoned the known right to the assistance of counsel, and thus that right had not been waived." Judge Marbury said for the Court that "the State concede[d], [that] the prohibition laid down in the *Massiah* case was meant to apply to the type of police questioning such as that which brought about Elliott's statement in the present case." By way of dicta it was observed:

"Under the *Massiah* test, absent an effective waiver of Sixth Amendment rights, no inculpatory

statement which is made by an indicted declarant will be allowed into evidence against him if such a statement is elicited from the accused when he does not have counsel present. The above interpretation is compelled by the language used in *Massiah*, at page 205 of 377 U. S., wherein Mr. Justice Stewart, speaking for the six member majority of the Court, quotes with approval the following language used in *People v. Waterman*, 9 N.Y.2d 561, 565, 175 N.E.2d 445, 448:

'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.'

Moreover, in the case of *State v. McLeod*, [1 Ohio St. 2d 60,] 203 N.E.2d 349 [(1964)], the Supreme Court of Ohio had a case similar (except that it was on direct review) to the instant one wherein the sole question presented was whether the *Massiah* exclusionary rule applied to a post indictment statement given to the police." *Id.* at 631.

Elliott was convicted in 1957. His conviction was affirmed by this Court in *Elliott v. State*, 215 Md. 152, 137 A. 2d 130 (1957). The Court referred to *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), and *Escobedo v. Illinois*, 378 U. S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964), and said that its resolution of "the question whether the principle enunciated in *Massiah* should be applied retroactively to cases such as the instant one, which had been finally litigated (no further possibility for direct review by any court) prior to May 18, 1964 — the date on which *Massiah* was decided . . . ha[d] been made measurably less difficult by the [then] recent . . . decision of the Supreme Court in *Johnson v. New Jersey*, 384 U. S. 719, [86 S. Ct. 1772, 16 L.Ed.2d 882 (1966),] wherein it was held that the constitutional principles enunciated in *Escobedo* and

*Miranda* . . . should be given only prospective application to cases in which trial had commenced before those decisions were announced." Our predecessors held:

> "In our view it would be exalting form over substance to distinguish the peculiar traits of the *Massiah* rule from that portion of the *Miranda* rule which simply applies that rule to a broader range of cases, and thus all the reasons delineated by the Supreme Court in *Johnson* for not making *Miranda* retroactive would apply with equal force as reasons for not making *Massiah* retroactive, and we adopt those reasons." *Id.* at 632-33.

It is unfortunate that the Supreme Court has not had occasion to amplify its views in *Massiah* and *McLeod* so that we might know precisely what was meant. Some regard *Massiah* as but the forerunner of *Escobedo* and *Miranda*. *Escobedo* discussed *Massiah*. *Miranda* extensively discussed *Escobedo*. Two distinct schools of thought have arisen across the country as to the manner in which *Massiah* is to be applied. The broad or liberal rule, called by some the "per se" rule, represents the distinct minority view. Cases espousing that view include *United States v. Thomas,* 474 F. 2d 110, 112 (10th Cir.), *cert. denied,* 412 U. S. 932 (1973) ("[O]nce a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present."); *United States ex rel. O'Connor v. State of New Jersey,* 405 F. 2d 632, 636 (3d Cir.), *cert. denied,* 395 U. S. 923 (1969) ("*Massiah* commands an absolute right to counsel after indictment, thereby vitiating the validity of all oral communications between the defendant and the police made in the absence of counsel."); *Hancock v. White,* 378 F. 2d 479, 482 (1st Cir. 1967) (*Massiah* "applies to exclude post-indictment incriminating statements of an accused to government agents in the absence of counsel even when not deliberately elicited by interrogation or induced by

misapprehension engendered by trickery or deception."); *State v. Gallagher*, 97 Ariz. 1, 7, 396 P. 2d 241 (1964); *State v. Witt*, 422 S.W.2d 304, 309 (Mo. 1967); and *State v. Green*, 46 N. J. 192, 215 A. 2d 546, 551 (1965), *cert. denied*, 384 U. S. 946 (1966).

An overwhelming majority of the courts in this country which have considered the matter have been restrictive in their application of *Massiah* and *McLeod*. *See, e.g., Moore v. Wolff*, 495 F. 2d 35, 37 (8th Cir. 1974) ("Petitioner's culpatory statements and admissions were triggered not by any trickery or cajolery of the police officers but by confrontation with his confederate, who had admitted the offense and implicated petitioner."); *United States v. Gaynor*, 472 F. 2d 899, 900 (2d Cir. 1973) ("[T]he [trial] court felt that for even a spontaneously volunteered statement to be legally 'voluntary' it must be interrupted and the defendant cautioned that what he says might be used against him. The cases in this circuit establish that this view of the law is erroneous. United States v. Garcia, 377 F. 2d 321, 324 (2d Cir.), cert. denied, 389 U. S. 991, 88 S. Ct. 489, 19 L.Ed.2d 484 (1967), points out that *Massiah* prevents the admissibility of incriminating statements only when 'law enforcement authorities have "deliberately elicited" incriminating statements from a defendant . . . by direct interrogation or by surreptitious means,' and that '[t]he rule does not apply to spontaneous or voluntary statements made by the defendant in the presence of government agents. . . .' " (Citing cases.)); *United States v. Tucker*, 435 F. 2d 1017, 1018 (9th Cir. 1970); *United States v. DeLoy*, 421 F. 2d 900, 902 (5th Cir. 1970) (Defendant, after indictment, appeared voluntarily and uninvited at an FBI office. He was advised of his rights, advised to call his attorney, and executed an FBI waiver form. "He was not coerced, cajoled, or tricked into an involuntary statement. The government did not elicit, solicit, or even suggest a statement and did not otherwise treat the defendant unfairly. He was allowed to speak only after a full and adequate *Miranda* warning on each occasion. We do not comprehend *Massiah* as a sweeping mandate tainting all post-indictment statements made by a defendant without the presence of his counsel. Police

officers are not made constitutionally deaf to the uncoerced, insistent, and untricked statement of a properly warned defendant." The court cited, among other cases, *Wilson v. United States*, 398 F. 2d 331 (5th Cir. 1968), *cert. denied*, 393 U. S. 1069 (1969), where oral admissions to agents of the Federal Bureau of Investigation made out of the presence of counsel were admitted. The accused persons had been arrested and brought before a United States Commissioner where an explanation of their constitutional rights as provided in *Miranda* was given. Counsel was appointed. On that day they declined to make any statement. The agents who took the subsequent statement knew that counsel had been appointed. The court in *Wilson* cited *Coughlan v. United States*, 391 F. 2d 371 (9th Cir.), *cert. denied*, 393 U. S. 870 (1968), where a confession was obtained after the appointment of counsel, a fact said by the court to have been "well known to the officers who interrogated the accused. No notice was given by the officers to defendant's counsel of the intended interviews and he was not present when the statement was taken." *Massiah* was mentioned in *DeLoy* but was not mentioned in either *Wilson* or *Coughlan*.); *Arrington v. Maxwell*, 409 F. 2d 849, 853 (6th Cir.), *cert. denied*, 396 U. S. 944 (1969); *United States v. Garcia*, 377 F. 2d 321, 324 (2d Cir.), *cert. denied*, 389 U. S. 991 (1967) ("*Massiah* was . . . not aimed at all post-indictment evidence gathered by the prosecution, but at the narrow situation where, after indictment, law enforcement authorities have 'deliberately elicited' incriminating statements from a defendant by direct interrogation or by surreptitious means. The rule does not apply to spontaneous or voluntary statements made by the defendant in the presence of government agents . . . ." (Citing cases.) "[I]t only protects against deliberate efforts of law enforcement agents which are specifically aimed at eliciting incriminating statements relative to the crime under indictment."); *Cephus v. United States*, 352 F. 2d 663, 664-65 (D.C. Cir. 1965), *cert. denied*, 384 U. S. 1012 (1966) (The opinion was by then Judge Burger. The accused, while lodged in the District of Columbia jail and more than two weeks after his preliminary hearing, made a request in

writing to see a certain police captain. The captain, in company with a detective, went to see the accused "who again consented in writing to see them. At the interview, [the accused] admitted three auto thefts, including the one charged, and asked about pleading guilty to a misdemeanor charge. The officers told [him] the latter request would be referred to the United States Attorney." At "trial the Government did not rely on Appellant's statements as part of its case in chief. But when Appellant testified on his own behalf and on cross examination denied all three car thefts and denied ever making admissions to [the officers], the Government introduced testimony of the two officers as to the statements made by Appellant two weeks after the preliminary hearing." The court said that *Massiah* and *Escobedo* "are not to be read as rendering inadmissible all uncounseled utterances made by an accused or arrested person."); *United States v. Gardner*, 347 F. 2d 405, 407-08 (7th Cir. 1965), *cert. denied*, 382 U. S. 1015 (1966); *United States v. Accardi*, 342 F. 2d 697, 701 (2d Cir.), *cert. denied*, 382 U. S. 954 (1965) ("[T]he facts and circumstances of the present case are clearly distinguishable from Escobedo and Massiah. The conversation at the . . . gas station was initiated entirely by Accardi as a protest of his innocence. There was no inducement offered him to make the statements, nor were they made because of any deception practiced upon him or through an attempt by [the government agent] to interrogate him. On the contrary, Accardi volunteered his statements to [the agent] who had made the trip to Bloomfield for an entirely different reason, who encountered Accardi by chance and who did not ask Accardi a single question concerning the merits of the case."); *Olguin v. People*, 179 Colo. 26, 29-30, 497 P. 2d 1254 (1972); *State v. Hatton*, 95 Idaho 856, 862-63, 522 P. 2d 64 (1974) ("The state concedes that Captain Lee did not advise Hatton of his *Miranda* rights before or during their conversation, although the record shows that Hatton had been advised of his rights at least four, and possibly as many as five times during the period since his arrest on June 12, 1970. Hatton was represented by counsel at the time when the conversation took place, but counsel was not notified or

present." It was pointed out that "[b]y relying on *Massiah* and *Escobedo*, some defendants have demanded exclusion of all statements made in the absence of counsel after such counsel has been appointed, regardless of the circumstances under which such statements were made." The court "concur[red] with the majority of courts which have rejected this view."); *People v. Milani*, 39 Ill. 2d 22, 233 N.E.2d 398, 402, *cert. denied*, 393 U. S. 865 (1968) (The second *McLeod* decision was discussed, the lack of such discussion being a reason advanced by the Court of Special Appeals for not following some of the cases cited to it. Although it supported the broad view of *Hancock v. White, supra*, the court "h[e]ld that *Massiah* may not be invoked to make inadmissible a post-indictment confession indiscreetly made to a fellow inmate who is not at the time an agent of the prosecution."); *Deskins v. Commonwealth*, 512 S.W.2d 520, 526 (Ky. 1974), *cert. denied*, 419 U. S. 1122 (1975); *Commonwealth v. Frongillo*, 359 Mass. 132, 136-37, 268 N.E.2d 341 (1971) ("Although it is clear that the *Massiah* case may not be confined to circumstances of surreptitious post-indictment interrogation, we decline to accept an interpretation of the *Massiah* and *McLeod* cases which would require automatic exclusion of all post-indictment incriminating statements made in the absence of counsel. We think that such a sweeping rule is hazardous in that it fails to take account of the special facts that arise in each new case. The *Massiah* and *McLeod* cases must be read in light of the Supreme Court's subsequent decision in *Miranda v. Arizona*, 384 U. S. 436, 478, which expressly recognized that, 'Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence.' In the present case, the defendant himself admitted that he deliberately sought out Sergeant Delaney in the hope that Delaney might be able to help him. The defendant was 'willing to cooperate with him' so that he would put in a good word for the defendant. The defendant admitted that, with this hope, he told Delaney about throwing the thirty 'decks' of heroin out the window. Delaney had testified that the defendant made the statement in joking about Spellman's failure to get the heroin. The judge was fully warranted in finding that the

defendant's statement was voluntary and made with complete knowledge of his constitutional rights; as such, it is admissible in evidence. See *Arrington v. Maxwell*, 409 F. 2d 849 (6th Cir.); *United States v. Crisp*, 435 F. 2d 354 (7th Cir.). Compare *Commonwealth v. McCarthy*, 348 Mass. 7, 11-12 (deliberate, direct police interrogation after indictment); *Commonwealth v. Kleciak*, 350 Mass. 679, 686 (not a post-indictment interrogation); *Commonwealth v. French*, 357 Mass. 356, 386-387."); *State v. James*, 76 N. M. 376, 382, 415 P. 2d 350 (1966) ("The holdings in Massiah v. United States, supra, and Escobedo v. Illinois, supra, do not purport to go so far as to preclude the use by the state of an admission voluntarily made in a casual conversation under the circumstances as they appear in this case."); *Doyle v. State*, 415 P. 2d 323, 324-25 (Nev. 1966); *State v. Lancaster*, 25 Ohio St. 2d 83, 267 N.E.2d 291 (1971), to which further reference will be made; *Dayton v. State*, 484 P. 2d 1322, 1324 (Okla. Crim. App. 1971); *Commonwealth v. Hoss*, 445 Pa. 98, 283 A. 2d 58, 65 (1971) ("[I]t is recognized that *Massiah* must be read in light of the subsequently decided *Miranda* decision."); *Pryor v. State*, 217 Tenn. 695, 700-02, 400 S.W.2d 700 (1966) (After the defendant was charged with the crime and while he was on bond a police officer, said by the court to have been "an old acquaintance," an individual known by the accused to be a police officer, asked the accused what happened. As it was put by the court, the accused "replied, 'I don't know what come over me. I know I knew better.' " The court said that this statement "was made about a week after [the date] when the defendant was made aware of and obviously understood his right to counsel and to refrain from making any statement." No counsel had been appointed as of that time. The court pointed out that "the defendant was aware that he was making the statement to an agent of the State and with this knowledge, freely and voluntarily made this statement." Thus, it reasoned "that the holding in *Massiah* . . . is not controlling."); *Miller v. State*, 468 S.W.2d 818, 821 (Tex. Crim. App. 1971); *Anders v. State*, 445 S.W.2d 167, 171-73 (Tex. Crim. App. 1969); *State v. Cadena*, 74 Wash. 2d 185, 192-93, 443 P. 2d 826 (1968) (The court cited, among other cases, *State v. Cole*, 67 Wash. 2d

522, 408 P. 2d 387 (1965), where at pp. 532-33 *Massah* was distinguished and a "tape recording of the conversation which took place in [a] county car while the defendant was being transported to Seattle" was admitted into evidence since "the defendant knew that he was engaging in a conversation with someone who would later be a witness against him," and *State v. Young*, 65 Wash. 2d 938, 400 P. 2d 374 (1965)); and *State v. Chabonian*, 50 Wis. 2d 574, 579-83, 185 N.W.2d 289 (1971) ("So the question asked on this appeal is whether a volunteered statement by a defendant becomes inadmissible if and only when the defendant is represented by legal counsel when he volunteers it. . . . Some courts, as we see it, have gone wrong in finding that, once a defendant has an attorney to represent him, statements volunteered by the defendant in the absence of such counsel are inadmissible. Such finding derives from a misreading and misapplication of the decision of the United States Supreme Court in the pre-*Miranda* case of *Massiah v. United States*. . . . [I]n the absence of coercion or trickery, which would by themselves negative complete voluntariness, a volunteered statement, given in the absence of defendant's counsel, nonetheless is admissible.").

We find instructive in the context of this case the Ohio case of *Lancaster*, previously cited. The prosecutor, defendant, and defense counsel were to meet to discuss the case. Defense counsel was more than three hours late for the meeting. During this interval the prosecutor and the accused engaged in conversation. He told the prosecutor that on the night of the crime he had played gin rummy in Newark. Some months before the trial Lancaster had filed a notice of alibi which he withdrew at trial. On direct examination he testified that he could not remember where he was at the time of the crime. On cross-examination he denied making statements to the assistant county prosecutor the week before the trial to the effect that he remembered being in Newark playing cards on the morning of the shooting. He replied affirmatively to a question as to whether he had played gin rummy in Newark "on or about September 3, 1965," (the date of the crime). He was next asked, over objection, "if [he] had told [the prosecutor] the previous week

that he specifically remembered playing gin rummy with one Barker the night of the crime." He indicated that he did not recall. He then "denied telling the prosecutor that he recalled that particular night because he had won and had been paid off with a chair in place of cash." The prosecutor took the witness stand and gave testimony concerning this "conversation and alleged statements he received from [the accused]" at the meeting previously mentioned. The court said:

> "Statements which an accused, in total freedom, chooses to volunteer to a prosecutor without prior cautionary warnings, are admissible on the issue of credibility after the accused has been sworn and testified in his own defense." *Id.* 25 Ohio St. 2d 88.

In the case at bar Blizzard allegedly sent for the police officer. Blizzard denies this but he does concede that the police officer was present at the request of a prisoner. The controversy involves the statement by the police officer that when he confronted Blizzard in jail he told him he did not wish to discuss that particular case because he had Blizzard "up tight" and the further statement by the officer that Blizzard agreed. This falls far short of an incriminating statement by the accused. The defense counsel elected not to cross-examine the officer in any way relative to the circumstances of the conversation. There is not the slightest hint that trickery or cajolery was in any way used by the police officer. The circumstances here do not come even close to those in *Miller v. California, supra,* in which the Supreme Court dismissed the writ of certiorari as "improvidently granted." An overwhelming majority of federal appellate courts and state courts of last resort in cases decided since the second *McLeod* decision have rejected the view that all uncounseled statements made after indictment by persons accused must be excluded from evidence. In the words of the Supreme Judicial Court of Massachusetts in *Frongillo*, "such a sweeping rule [(requiring exclusion of all incriminating statements made in the absence of counsel)] is hazardous in that it fails to take account of the special facts that arise in each new case." Counsel caught up in the heat of the trial of

a case often fight over points, including whether some questions should or should not be propounded, which they surely must recognize as trivial when they leave the arena of battle and calmly reflect upon what has transpired in the courtroom. They must conclude that some of these battles concern matters of no real importance to the outcome they sought. Some of the contests on behalf of the prosecution in a criminal case or the plaintiff in a civil case surely come under the category of "over kill." Such may well be the case here. We find the controversy here to be strikingly similar to the situation in *Lancaster* where the Ohio court found the evidence "admissible on the issue of credibility" and to that in *Cephus* where, as Judge Danaher pointed out in his concurring opinion, 352 F. 2d 663, 667, the "statements to the officers were received by way of impeachment only after [the accused] had testified that he had not consented to see the police and that he had no recollection of 'requesting to talk to the officers.'" He said at 668, "The courts do not justify letting a 'defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.' Walder v. United States, 347 U. S. 62, 65, 74 S. Ct. 354, 356, 98 L.Ed.2d 503 (1954)."

On the facts of this case we do not perceive Blizzard to have been denied the right of counsel nor do we find that he has been compelled to give evidence against himself in a criminal case. Thus, we find no error under the Constitution of the United States or under the Maryland Declaration of Rights.

> *Judgment of the Court of Special Appeals reversed; case remanded to that court for passage of an order affirming the judgment of the Circuit Court for Baltimore County; appellee to pay the costs.*

*Levine, J., dissenting*:

I respectfully dissent, since I believe that *Massiah v. United States*, 377 U. S. 201, 84 S. Ct. 1199, 12 L.Ed.2d 246

(1964), proscribes admission of the testimony concerning appellee's conversation with Sergeant Zero.

Prior to *Massiah*, confessions were excluded from evidence only if found to be involuntary. By relying on the Sixth Amendment right to counsel rather than the Due Process Clauses of the Fifth and Fourteenth amendments, *Massiah* extended this exclusionary rule to certain voluntary, post-indictment admissions:

> ". . . We hold that the petitioner was denied the basic protections of [the Sixth Amendment] when there was used against him at his trial evidence of his own *incriminating words*, which federal agents had *deliberately elicited* from him after he had been indicted and in the *absence of his counsel*. It is true that in [*Spano v. New York*, 360 U. S. 315, 79 S. Ct. 1202, 3 L.Ed.2d 1265 (1959)] the defendant was interrogated in a police station, while here the damaging testimony was elicited from the defendant without his knowledge while he was free on bail. But, as Judge Hays pointed out in his dissent in the Court of Appeals, 'if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. In this case, Massiah was more seriously imposed upon . . . because he did not even know that he was under interrogation by a government agent.' [*United States v. Massiah*, 307 F. 2d 62, 72-73 (2d Cir. 1962)]." 377 U. S. at 206 (emphasis added).

The Supreme Court extended the confession rule in this manner because "[a]*ny secret* interrogation" of the defendant after indictment contravenes the "basic dictates of fairness," that a defendant be entitled to the aid of counsel at the stage when legal aid and advice would help him. 377 U. S. at 204-05 (emphasis added). *See also United States v. Anderson*, 523 F. 2d 1192, 1195 (5th Cir. 1975).

A fair reading of *Massiah*, I think, would suggest that a court always has discretion to find either that the

defendant's words were not incriminating or that they were not deliberately elicited. The only question is whether there can be an effective waiver of the right to counsel or whether the absence of counsel absolutely bars admission of the evidence, regardless of waiver by the defendant. This last requirement of presence of counsel is the nub of the "automatic rule" against which Mr. Justice White protested vehemently in his dissent. *Massiah v. United States, supra,* 377 U. S. at 213. Although the plain language of the majority's opinion in *Massiah* suggests it was establishing an automatic rule, it must be remembered that *Massiah* did not present this exact issue since Massiah was afforded no effective opportunity to waive his right to counsel. Although there has been some dispute among the courts considering the issue, I agree with the majority of them that there can be an effective waiver of this right. Indeed, this Court held as much in *Elliott v. Warden,* 243 Md. 627, 631, 222 A. 2d 55 (1966),[1] where we stated:

> ". . . Under the *Massiah* test, absent an effective waiver of Sixth Amendment rights, no inculpatory statement which is made by an indicted declarant will be allowed into evidence against him if such a statement is elicited from the accused when he does not have counsel present."

*See also Sabatini v. State,* 14 Md. App. 431, 448-49, 287 A. 2d 511, *cert. denied,* 265 Md. 742 (1972).

Thus, the factual questions we must review in our independent analysis of the facts are: (1) was the defendant's statement incriminating, (2) was the statement deliberately elicited, and (3) was counsel present, and if not, did the defendant effectively waive his right to counsel.

I neither understand nor accept the majority's bald

---

1. The majority now claims our holding in *Elliott* was mere dicta. We would not have reached the retroactivity question which Elliott raised if we had not first decided that admission of Elliott's statements violated *Massiah.* The concession of the Warden that admission of the evidence violated *Massiah* did not deprive us of the duty to decide that constitutional issue. Consequently, our narrowed statement of the *Massiah* rule was "necessary to a determination of [an] issue," Kardy v. Shook, 237 Md. 524, 544, 207 A. 2d 83 (1965), and is not dicta.

conclusion that Blizzard's statement was not incriminating. To my mind, it clearly was. It is patently absurd to suggest that because Blizzard said only that "he knew it," he said nothing incriminating. The jury could reasonably infer from his statement that his alibi was fabricated and, further, that he knew the State had a very strong case against him.

As I read its opinion, the majority also finds that the statement was not deliberately elicited because Sergeant Zero employed no "trickery or cajolery." Although statements may perhaps be deliberately elicited without trickery or cajolery, here these methods were utilized. The practice of trapping an unwary person by asking a so-called misleading question is hardly a novel one. Here Sergeant Zero's statement was all the more insidious because he did not ask a question, but instead placed Blizzard in a position where any response, or even no response, might appear incriminating to a jury. In short, as the Court of Special Appeals aptly noted, the remark "may well have been calculated to bait [Blizzard]." *Blizzard v. State*, 30 Md. App. 156, 164, 351 A. 2d 443 (1976). *See also United States v. Anderson, supra,* 523 F. 2d at 1196 n. 3.

The majority, of course, concedes that Blizzard's statement was made in the absence of counsel. The majority alludes to the controverted testimony to the effect that Blizzard requested to see Sergeant Zero, but it does not decide whether or not Blizzard effectively waived his right on this occasion. Nor was any finding or ruling to that effect made by the trial court. Although some courts may require both notice to counsel and reasonable opportunity to be present before the right can be waived, *see, e.g., United States v. Thomas,* 474 F. 2d 110, 112 (10th Cir.), *cert. denied,* 412 U. S. 932 (1973), I see no necessity for deciding that issue here. For the *Massiah* rule to retain its efficacy, waiver of the right to counsel cannot be premised on an inference drawn from controverted testimony concerning the defendant's actions, namely, a request that a police officer come to the jail — a request Blizzard denies making. Surely there must be some indication by the defendant that he wished to waive his right to counsel before it can be said that

he effectively waived that right. Indeed, here, by stating that he did not wish to discuss the case with Zero, Blizzard may well have been attempting to exercise his right, not to waive it.[2] Since there has been no suggestion that Blizzard expressly waived his right to counsel, not even orally, I conclude that he did not effectively waive his constitutional right.[3]

Finally, the majority suggests that even if *Massiah* proscribes admission of this evidence, its admission was not prejudicial as the matter is "trivial" and "of no real importance." Arguably, the right to counsel is one of those constitutional rights so basic to a fair trial that its denial can never be treated as harmless error, *see State v. Renshaw*, 276 Md. 259, 271, 347 A. 2d 219 (1975), but even if that doctrine does apply, *United States v. Anderson, supra*, 523 F. 2d at 1196-97, it cannot be said that the error here was

---

**2.** The prosecution's introduction of this episode into the case smacks of an attempt to comment on a defendant's lawful exercise of his constitutional right, a tactic condemned a dozen years ago with respect to the exercise of the right not to testify. Griffin v. California, 380 U. S. 609, 615, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1965).

**3.** The State argues that even if *Massiah* would preclude admission of this evidence in the State's case-in-chief, the rule does not preclude introduction in rebuttal of Blizzard's incriminating admission that the State had a strong case against him, to impeach the defendant's testimony that he was not present at the scene of the crime. I read the majority opinion to hold that *Massiah* does not apply here because the statement was neither incriminating nor deliberately elicited. The majority then adds some questionable dicta to the effect that even if Blizzard has made out the elements of a *Massiah* objection, he fails because the testimony was used in rebuttal and was admissible on the issue of credibility. Although I note that there was no instruction to the jury limiting its consideration of this testimony to impeachment, I would not reach the basic issue whether a statement made by the defendant in circumstances rendering it inadmissible to establish the prosecution's case-in-chief under *Massiah* may be used to impeach his credibility. *Cf.* Harris v. New York, 401 U. S. 222, 91 S. Ct. 643, 28 L.Ed.2d 1 (1971) (evidence inadmissible for case-in-chief under Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), is admissible for impeachment); Oregon v. Hass, 420 U. S. 714, 95 S. Ct. 1215, 43 L.Ed.2d 570 (1975) (same). I also note that Cephus v. United States, 352 F. 2d 663 (D.C. Cir.), *cert. dismissed*, 382 U. S. 897 (1965), upon which the majority heavily relies, is inapplicable since the controverted statements there were made before indictment. 352 F. 2d at 668 (Washington, J. dissenting). State v. Lancaster, 25 Ohio St. 2d 83, 267 N.E.2d 291, 294 (1971), moreover, held that defendant's statements were voluntary but were not deliberately elicited, and that therefore *Massiah* could not apply. That court then went on to hold that even though the statements were made without the appropriate *Miranda* warnings having been given, the statements could be admitted for impeachment.

"harmless beyond a reasonable doubt." *Chapman v. California,* 386 U. S. 18, 24, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967). Only one of the four persons in the store at the time of the robbery identified the perpetrator, who was wearing a nylon stocking mask, as Blizzard. The State's only other witnesses were two supposed confederates. One of them, Markert, had been tried separately and found guilty and had been promised additional protection for his family in exchange for his testimony. The other was granted immunity. Blizzard, on the other hand, in addition to testifying himself, presented three witnesses in support of his alibi and two witnesses who testified about conversations they had with Markert in which he disclosed a scheme to frame Blizzard. In this context, the testimony about Blizzard's statement may well have tipped the scale.

Because the State has failed, in my view, to show that *Massiah* is inapplicable to the circumstances of this case, I would affirm the judgment of the Court of Special Appeals and remand the case for a new trial. Judge Eldridge authorizes me to state that he concurs in the views expressed herein.